| | |
|---|---|
| STEPHEN ROSENBERGER and MARGIT ROSENBERGER, Plaintiffs, <br><br> v. <br><br> AMICA MUTUAL INS. CO., Defendant. | No. 3:17-cv-612 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Stephen Rosenberger and Margit Rosenberger (the "Rosenbergers" or "Plaintiffs") sued Amica Mutual Insurance Co. ("Amica" or "Defendant") after the insurance company denied coverage for cracking in the concrete in the basement of their South Windsor home. After moving to amend their Complaint, the Rosenbergers assert three claims: breach of contract; breach of the covenant of good faith and fair dealing; and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42–100a *et seq.*, and the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a–815 *et. seq.*

Defendant now moves to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Def. Mot, ECF No. 11.

For the following reasons, the motion is **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Rosenbergers live and own a home in South Windsor, Connecticut. Am. Compl. ¶ 1, ECF No. 47. Amica, an insurance company, is incorporated under the laws of the State of Rhode Island and licensed to provide homeowners insurance coverage in Connecticut. *Id.* ¶ 2.

## A. Factual Allegations

The Rosenbergers have insured their home with Amica since 1989, and have made all required payments. *Id.* ¶ 3. According to both parties, the policy language changed several times over the course of the Rosenbergers' relationship with Amica. *Id.* ¶ 14-15; Def. Mem. at 9-11.[1] The relevant portions of these policies may be grouped into three distinct time periods: the policy language before December 18, 2006; the policy language amended on December 18, 2006, and in effect between December 18, 2006, and December 18, 2012; and the policy language as amended on December 18, 2012, and in effect until at least December 18, 2017. *See* Def. Mem. at 4, 9, 12.

### 1. The Policy Language Before December 18, 2006

Under the policy language in effect place between December 18, 2005, and December 18, 2006, Amica "insure[d] for direct physical loss to covered property involving collapse of a building," but only if "caused . . . by one or more of the following:"

> a. Perils Insured Against in COVERAGE C—PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;
> b. Hidden decay;
> c. Hidden insect or vermin damage;
> d. Weight of contents, equipment, animals or people;
> e. Weight of rain which collects on a roof; or
> f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.
>
> Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under

---

[1] Amica attached a series of annual policies to its motion to dismiss, which do not correspond to the exhibit numbers. *See, e.g*, Def. Mem. at 4 (labelling policies issued between 2012 and 2017 as exhibits 3 through 7 of the Complaint). The Court will reference the exhibit number as filed on the docket, not as cited in the briefs.

> items b., c., d., e., and f., unless the loss is a direct result of the collapse of a building.
>
> Collapse does not include settling, cracking, shrinking, bulging or expansion.
>
> This coverage does not increase the liability applying to the damaged property.

Homeowners Policy ("Dec. 2006 Policy") at 5, Def. Mot. to Dismiss, Ex. 3, ECF No. 36-4. The policy also excluded coverage for collapse stemming from "wear and tear, marring, deterioration," "inherent vice, latent defect, mechanical breakdown," smog or smoke, discharge of pollutants and "[s]ettling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings[.]" *Id.* at 7-8.

The 2006 policy appears not to include any provisions explicitly excluding coverage for a chemical reaction. *Compare with* Am. Compl. ¶ 10 ("Pursuant to coverage of the aforementioned homeowner's insurance policy, losses due to chemical reaction are not excluded from policy coverage."). The policy did exclude "inherent vice, latent defect, mechanical breakdown" and "smug rust or other corrosion . . . ." Dec. 2006 Policy at 8.

The policy provided that "[i]n the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage." *Id.* at 4. Finally, the 2006 policy stated that "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss." *Id.* at 12.

### 2. The Policy Language Between to December 18, 2006, and December 18, 2012

The post-2006 policy insured "against risks of direct physical loss to property described in Coverages A and B." *See, e.g.*, Homeowners Policy ("Dec. 2009 Policy") at 8, Def. Mot. to Dismiss, Ex. 7, ECF No. 36-8. Those risks included collapse, but under a significantly modified

definition. The new policy language stated that "[c]ollapse applies only to an abrupt collapse."

*Id.* at 7. Furthermore, collapse is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." *Id.* at 7. The provision includes several exclusions, *id.*:

> C. This Additional Coverage – Collapse does not apply to:
> (1) A building or any part of a building that is in danger of falling down or caving in;
> (2) A part of a building that is standing, even if it has separated from another part of the building; or
> (3) A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

The policy also modified the "hidden decay" section included in the 2006 policy, stating that it covered collapse, if caused by "[d]ecay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." *Id.* at 7.

### 3. The Policy Language Between to December 18, 2012 and December 18, 2017

More recent policies still require a collapse to be "abrupt." For instance, the policy issued to the Rosenbergers in December, 2016, defines collapse as applying "only to an abrupt collapse" and meaning "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." *See, e.g.*, Homeowners Policy ("Dec. 2016 Policy") at 7, Def. Mot. to Dismiss, Ex. 14, ECF No. 36-15.

The policy, however, no longer included "risk of" related to its loss provisions. *Compare* Dec. 2009 Policy at 8 (covering "risks of direct physical loss") *with* Dec. 2016 Policy at 7 ("We insure for direct physical loss to covered property involving abrupt collapse of a building or any part of a building . . . .").

#### 4. The 2015 Claim

At some point before March 2015, the Rosenbergers allege they noticed cracking patterns in the basement walls of their home. Am. Compl. ¶¶ 4-5. They employed a professional structural engineer to inspect the walls, and the engineer "indicated that there was a chemical reaction occurring in the concrete which will cause the structure to eventually fail" and recommended the walls be replaced. *Id.* ¶¶ 6-7.

The Rosenbergers allegedly timely filed a claim with Amica, arguing that "because of the damages caused by the chemical reaction" addressed in engineering report, they were entitled to coverage for "any ensuing loss as well as reasonable repairs as caused by the condition of the premises." *Id.* ¶ 12.

Amica allegedly denied coverage on December 15, 2016. *Id.* ¶ 13. The Rosenbergers claim that Amica's denial was "in its discretion, unreasonably and in bad faith" and the result of purposely interpreting policy provisions in a way to delay or deny coverage. *Id.* ¶ 18. Additionally, they claim Amica participated in the Insurance Services Office, Inc. ("ISO"), had knowledge "of numerous claims" based on deteriorating concrete pending in Connecticut, and "provided a false and misleading denial of coverage" in part "[b]ased on the aforementioned received via ISO . . . ." *Id.* ¶¶ 23-24.

### B. Procedural History

On March 20, 2017, the Rosenbergers sued Amica in Connecticut Superior Court, Judicial District of Tolland at Rockville. *See* Notice of Removal ¶ 1, ECF No. 1. The Complaint included one count alleging breach of contract. *See generally* Compl., ECF No. 1-1. Amica then invoked this Court's diversity jurisdiction under 28 U.S.C. §1332(a).

Amica moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def. Mot. to Dismiss, ECF No. 9. Similar to the motion at issue here, Amica argued that the Rosenbergers failed to allege an "abrupt" collapse and that coverage "due to a 'chemical reaction' . . . is explicitly excluded" under the terms of the policies. *Id.* at 1. Amica also argued that the Rosenbergers could not "satisfy their burden to show their claimed loss occurred during the period of time they were insured by Amica and they therefore have failed to state a claim upon which relief can be granted." *Id.* at 1-2.

The Rosenbergers opposed the motion to dismiss, ECF No. 20, but while the motion was pending, they also moved to amend their Complaint. *See* Pls. Mot. to Am., ECF No. 30. The Amended Complaint included substantially similar allegations regarding the breach of contract claim. *See generally* Am. Compl. It added two counts, however: a breach of the implied covenant of good faith and fair dealing, and violations of CUTPA and CUIPA. *Id.* The Court granted the motion to amend. *See* Order, ECF No. 34.

Amica now renews its motion to dismiss. *See generally* Def. Mot. to Dismiss ("Def. Mot."), ECF No. 36; Def. Mem in Support ("Def. Mem."), ECF No. 36-1. The insurance company again argues that the breach of contract claim should be dismissed because it argues the plaintiffs fail to allege any claimed damage was abrupt or that the house cannot be occupied for its intended purpose, and because a "chemical reaction" is excluded under the terms of the policy. Def. Mot. at 1-2. Amica also argues that the Rosenbergers' other claims fail, if their breach of contract claims fail. *Id.* at 2. Alternatively, the insurance company argues that the Rosenbergers failed to plead "facts sufficient to show" a breach of the implied covenant of any implied covenant or violations of CUTPA and CUIPA. *Id.*

The Rosenbergers oppose the motion. *See* Pl. Mem. of Law in Opp. ("Pl. Mem."), ECF No. 38. They argue that they have a viable claim under the "collapse" provisions, and that "[n]one of [the exclusions in the policy] list losses due to a chemical reaction." *Id.* at 9. Additionally, they argue that the "Reasonable Repairs" provision "may afford coverage for the eventual collapse as a result of the chemical reaction." *Id.* at 10. They also argue they have pleaded sufficient factual allegations to survive the motion to dismiss on Counts II and III. *Id.* at 12-17.

## II.     STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A court will dismiss any claim that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), the court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

All of the factual allegations in the complaint will be taken as true. *Iqbal*, 556 U.S. at 678. The factual allegations will also be viewed in the light most favorable to the plaintiff, and all inferences will be drawn in favor of the plaintiff. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

A court considering motions to dismiss under Rule 12(b)(6) generally limit its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005). Accordingly, the court may review the homeowner's insurance policies in this record.

## III. DISCUSSION

This case, like an increasing number of recent decisions in the District of Connecticut, requires the Court to examine the provisions of an insurance policy after homeowners have discovered that the concrete supporting the walls of their home are deteriorating. *See, e.g., Zamichie v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-CV-739 (VAB), 2018 WL 950116 (D. Conn. Feb. 20, 2018); *Cyr v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-85 (DJS), slip op. (D. Conn. Jan. 29, 2018); *Makufka v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-00567 (VLB), 2018 WL 465775

(D. Conn. Jan. 18, 2018); *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2017

WL 6731713 (D. Conn. Dec. 29, 2017); *Allstate Ins. Co. v. Swaminathan*, No. 3:16-cv-1708

(VAB), 2017 WL 6614092 (D. Conn. Dec. 27, 2017); *Liston-Smith v. CSAA Fire & Cas. Ins.

Co.*, No. 3:16-cv-510 (JCH), 2017 WL 6459552, (D. Conn. Dec. 15, 2017); *Lees v. Allstate Ins.

Co.*, No. 3:15-cv-1050 (VAB), 2017 WL 5906613 (D. Conn. Nov. 30, 2017); *Manseau v.

Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS), 2017 WL 3821791 (D. Conn. Aug. 31, 2017); *Adams

v. Allstate Ins. Co*., 276 F. Supp. 3d 1 (D. Conn. 2017); *Clough v. Allstate Ins. Co. et al*., No.

3:17-cv-140 (JBA) (D. Conn. Aug. 29, 2017); *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-

cv-1686 (SRU), 2017 WL 3710786 (D. Conn. Aug. 28, 2017); *Valls v. Allstate Ins. Co.*, No.

3:16-cv-1310 (VAB), 2017 WL 4286301 (D. Conn. Sept. 27, 2017); *Metsack v. Liberty Mut.

Fire Ins. Co.*, 3:14-cv-1150 (VLB), 2017 WL 706599 (D. Conn. Feb. 21, 2017).

The Rosenbergers, as did the plaintiffs in each of those other cases, allegedly discovered

cracking in their basement walls that would require replacement of the walls. The critical issue is

whether the Rosenbergers have sufficiently alleged that one of their homeowner policies would

cover the deteriorating condition.

### A.    Breach of Contract

The Rosenbergers allege that Amica breached its agreement with them, when the

company denied coverage for their claim related to the cracking patterns in their basement walls.

Am. Compl. ¶ 9, 16. Amica has moved to dismiss the breach of contract claim under Rule

12(b)(6) of the Federal Rules of Civil Procedure. *See* Def. Mem. at 16-25. It argues, first, that the

plaintiffs fail to state a claim because the language of the policies in place between 2006 and

2017 exclude any collapse that is not an "abrupt collapse," and that the Rosenbergers have not

pleaded an abrupt collapse. *Id.* at 21-24. Second, while noting that the plaintiffs have not

clarified under which policy the alleged breach occurred, Amica argues that "to the extent

Plaintiff's Complaint seeks coverage under policies issued prior to December 18, 2006 . . .

Plaintiffs' allegations do not "plausibly suggest[]" a substantial impairment to the structural

integrity of the home. *Id.* at 2. The Court disagrees.

Under Connecticut law, the terms of an insurance policy are "construed according to the

general rules of contract construction." *Liberty Mutual Insurance Co. v. Lone Star Industries,*

*Inc.*, 290 Conn. 767, 795 (2009) (internal quotations and citations omitted). While contracts are

strictly construed in favor of the insured, "the mere fact that the parties advance different

interpretations of the language in question does not necessitate a conclusion that the language is

ambiguous." *Id.* at 796. "The court must conclude that the language should be construed in favor

of the insured unless it has 'a high degree of certainty' that the policy language clearly and

unambiguously excludes the claim." *Id.* (quoting *Kelly v. Figueiredo*, 223 Conn. 31, 37 (1992)).

### 1.      The Collapse Provision

Courts in this District have now drawn a key distinction when examining the "collapse"

provision of insurance policies in light of pending concrete claims. This distinction turns on

whether the term "collapse," as defined in the policy, stands alone or is modified by other terms

indicating some temporal quality. *Compare Hurlburt v. Massachusetts Homeland Ins. Co.*, No.

3:17-CV-503 (VAB), 2018 WL 1035810, at *5 (D. Conn. Feb. 23, 2018) (interpreting policy that

defined "collapse" as "an abrupt falling down," and stated that the policy covered "sudden and

accidental direct physical loss" to be unambiguous and "require[] a temporal quality") *with*

*Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 404 (D. Conn. 2017) (holding, at

summary judgment, that a policy that "does not define the term 'collapse'" would be evaluated

under the Connecticut Supreme Court's definition in *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246 (1987)).

When the collapse term is undefined or unqualified, courts in this District generally apply the Connecticut Supreme Court's decision in *Beach*. *See, e.g.*, *Roberts*, 264 F. Supp. 3d at 404; *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 114 (D. Conn. 2014) (applying *Beach* and noting "[w]ith respect to the breach of the agreement, the Karases allege that the basement walls suffered a substantial impairment to their structural integrity, which constitutes a collapse.");[2] *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 163 (D. Conn. 2014) (applying *Beach* standard and denying motion to dismiss because "the Belzes have alleged that the cracks in the basement walls are a substantial impairment to walls' structural integrity.").

In *Beach*, the plaintiffs noticed a crack in the foundation wall of a building they owned, and sought coverage under an insurance policy that included coverage for "collapse" but excluded coverage for damages arising from "settling, cracking, shrinkage, bulging or expansion." 205 Conn. at 248. There, the insurance company argued that "collapse" should be interpreted one of two ways: first, requiring a "sudden and complete catastrophe" or, second, that reading the policy as a whole required it to be limited to "casualty of a sudden and cataclysmic nature." *Id.* at 250-51. The Connecticut Supreme Court rejected those definitions, instead holding that when collapse was not defined in an insurance policy, the term "include[s] coverage for any

---

[2] In *Karas*, the court subsequently certified the following question to the Connecticut Supreme Court: "What constitutes a 'substantial impairment of structural integrity' for purposes of applying the 'collapse' provision of this homeowners' insurance policy?" *Karas v. Liberty Ins. Corp.*, No. 3:13-cv-01836 (SRU), 2018 WL 2002480, at *5 (D. Conn. Apr. 30, 2018). The Court noted that it found the *Beach* standard was "relatively clear" but certified because the definition raised "important issues of public policy" and was "likely—indeed, almost certain—to recur . . . ." *Id.* at *2 (internal quotations and citations omitted). The Court notes that the Connecticut Supreme Court's answer to the certified question may have some bearing on the Rosenbergers' claims, but, under current law, the case will proceed.

substantial impairment of the structural integrity of a building." *Id*. The defendant insurance company could be held "liable even though no actual caving-in occurred and the structure was not rendered completely uninhabitable." *Id.* at 253. "Requiring the insured to await an actual collapse would not only be economically wasteful, but would also conflict with the insured's contractual and common law duty to mitigate damages." *Id*. at 253 n.2.

Applying the *Beach* definition, courts in this District have regularly found the "collapse" provision of insurance policies ambiguous and denied motions to dismiss as a result. *See, e.g., Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-01686 (SRU), 2017 WL 3710786, at *4 (D. Conn. Aug. 28, 2017) ("For the reasons stated by the Connecticut Supreme Court *in Beach v. Middlesex Mutual Assurance Co.*, and subsequently followed by many judges of this court, I conclude that the term 'collapse,' standing alone, 'is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building.'").

In contrast, when collapse is modified by terms such as "sudden and accidental" or "abrupt," courts in this District continually have held that the terms of the policy are unambiguous and that the plaintiffs in concrete cases have not alleged such a collapse. *See, e.g.*, *Valls v. Allstate Ins. Co*., No. 3:16-cv-01310 (VAB), 2017 WL 4286301, at *5 (D. Conn. Sept. 27, 2017) ("The Vallses' policy, however, explicitly requires that any collapse be 'a sudden and accidental direct physical loss' and a 'complete collapse.' As addressed above, they have not alleged a sudden collapse."); *Manseau v. Allstate Insurance Co*., No. 3:16-cv-1231 (MPS), 2017 WL 3821791, at *5 (D. Conn. Aug. 31, 2017) ("Regardless of whether the loss is characterized as a collapse or a chemical reaction, Plaintiffs fail to allege that any loss occurred suddenly, that is, temporally abruptly, as required for coverage to apply."); *Hurlburt v. Massachusetts Homeland Ins. Co*., No. 3:17-cv-503 (VAB), 2018 WL 1035810, at *5 (D. Conn. Feb. 23, 2018)

("Here, the contract language is unambiguous; the limiting term 'sudden' requires a temporal quality.").

The Court must therefore look to the specific language of the policy to determine whether the *Beach* definition applies and the term "collapse" is ambiguous, or whether the term is modified and therefore rendered unambiguous.

### 2. The Rosenbergers' Policies

The policies at issue in this case implicate both sides of the distinction. It is clear that, after 2006, the collapse provision was amended and the collapse provision stated that "[c]ollapse applies only to an abrupt collapse." *See, e.g.*, Dec. 2016 Policy at 7. "Abrupt collapse" is not ambiguous: the court in *England*, for instance, interpreted nearly identical claims arising under the same policy language as that the Rosenbergers' post-2006 insurance policies. *See England v. Amica Mut. Ins. Co.,* No. 3:16-CV-1951 (MPS), 2017 WL 3996394 (D. Conn. Sept. 11, 2017). The court found that the "Policies . . . unambiguously require an abrupt event for collapse coverage to apply" and "[e]ven when the allegations are construed in the light most favorable to Ms. England, Ms. England does not allege that any collapse occurred abruptly, or that any change occurred to the Property without preparation or warning." *Id.* at *5.

This Court reached a similar conclusion in *Hurlburt*, 2018 WL 1035810, at *5. The Court cited to *England* and held that "abrupt" was not ambiguous and was "characterized by or involving action or change without preparation or warning." *Id.* (quoting *England*, 2017 WL 3996394 at * 5). The Court concluded that "[t]he contract covers only "abrupt" collapse. By alleging that the concrete in their basement is deteriorating, which may or may not lead to a collapse, the Hurlburts have not alleged an 'abrupt collapse.'" *Id.* The Court granted the motion to dismiss.

But this case is different from the result in both *Hurlburt* and *England*. Amica only defined "collapse" in 2006, and previous policies did not define the term. Instead, these policies — which Amica themselves have attached to their motion — stated merely that the policy "insure[s] for direct physical loss to covered property involving collapse of a building" if it resulted from certain causes, including hidden decay. Dec. 2006 Policy at 5.

The unadorned statement of collapse in the pre-2006 policies implicates *Beach*. *Cf. Gabriel v. Liberty Mut. Fire Ins. Co.* ("*Gabriel II*"), No. 3:14-cv-01435-VAB, 2017 WL 6731713, at *6 (D.Conn. Dec. 29, 2017) ("On Liberty Mutual's motion for summary judgment, the inquiry therefore becomes whether the insurance company has met its burden and, viewing the facts in the light most favorable to the Gabriels, demonstrated that no jury could find such a substantial impairment has occurred."). The motion to dismiss therefore must be denied if the plaintiffs can show two things: (1) that the 2006 policy might apply; and (2) that the Amended Complaint sufficiently alleges a "substantial impairment of the structural integrity of a building." *Beach*, 205 Conn. at 252. They have.

First, the pre-2006 policies may be applicable here. Amica argues that the Rosenbergers "have not pleaded facts 'plausibly suggesting' that they can satisfy their burden to show their claimed loss occurred during the period of time they were insured by Amica and, therefore, they have failed to state a claim upon which relief can be granted . . . ." Def. Mem. at 2. But the Amended Complaint states that Amica has insured the property since 1989. Am. Compl. ¶ 3. The Amended Complaint also alleges that the couple noticed the cracking sometime before March 30, 2015, and that, at that point, the walls already needed to be replaced. Am. Compl. ¶ 6-8. And, in their response brief, the plaintiffs argued that they "have owned the property since it was

built" and "have had insurance with the Defendant since before this home was built." Pl. Mem. at 11.

It therefore is plausible that the damage to the walls might have occurred under Amica's pre-2006 coverage. *Accord. Karas*, 33 F. Supp. 3d at 116 (finding plaintiffs plausibly alleged breach of insurance policy where plaintiffs alleged that substantial impairment occurred at some point between time pouring of basement walls and discovery of cracks, and period covered by insurance policy was within that span); *Gabriel v. Liberty Mut. Fire Ins. Co.* ("*Gabriel I*"), No. 3:14-cv-01435-VAB, 2015 WL 5684063, at *4 (D. Conn. Sept. 28, 2015) (finding plaintiffs had "raised their right to relief above the speculative level" where they had pleaded facts demonstrating that a "substantial impairment to the walls' structural integrity" occurred at a time where insurance policy was in place).

Second, the Rosenbergers have also properly alleged a "substantial impairment" under *Beach*. Amica advances two arguments as to why dismissal is appropriate even under the pre-2006 policy. Amica's primary argument is that the Rosenbergers offer only a "conclusory statement that the condition of the basement walls 'substantially impairs the structural integrity of the dwelling.'" Def. Br. at 25-26.

Amica, however, reads the Amended Complaint too narrowly. The Rosenbergers do allege that the cracking "substantially impairs the structural integrity of the dwelling" and such a conclusory statement alone would be insufficient to survive as 12(b)(6) motion. *Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). But that is not the only factual allegation

pleaded. They also allege that the basement walls are failing and need to be replaced, and that there was a chemical reaction occurring, causing the walls to have "visible cracking patterns."[3] Am. Compl. ¶¶ 5-9. The combination of these allegations, accepted as true, push the Amended Complaint over the line.

Amica also argues that the pre-2006 claims would fail because "[p]laintiffs do not, and cannot, allege that their house is unsafe to occupy" because the Rosenbergers "continue to live in their home." Def. Mem. at 26. Of course, "unsafe to occupy" is not the applicable standard. *See Beach,* 205 Conn. at 248 (holding insurance company "liable even though no actual caving-in occurred and the structure was not rendered completely uninhabitable."). Nor is there an "imminence" requirement in the *Beach* definition *See Gabriel II,* 2017 WL 6731713, at *5–6 (rejecting defendant's argument that *Beach* required a structure to be in imminent danger of collapse).

A fuller factual record may demonstrate that the damage to the basement walls did not rise to the level of "collapse" under *Beach* until some point after 2006 and the Rosenbergers therefore would have to meet the more stringent "abrupt collapse" standard. *Compare Jemiola v. Hartford Cas. Ins. Co.,* No. CV-15-6008837-S, 2017 WL 1258778, at *7 (Conn. Super. Ct. Mar. 2, 2017) (granting summary judgment where the factual record and expert testimony demonstrated the loss "can be traced to October 2006" and that the policies changes in the years before the loss precluded coverage) *with Gabriel II,* 2017 WL 6731713, at *7 ("Put another way, Liberty Mutual does not just dispute whether there has been a substantial impairment, but when

---

[3] Cracking alone, of course, would not be enough either. Even the pre-2006 policy excludes mere "settling, cracking, shrinking, bulging or expansion." Dec. 2005 Policy at 5-6. But if such a condition rises to the level of a "substantial impairment," it would be covered. *See Beach,* 205 Conn. at 252.

the damages would have amounted to a substantial impairment. Viewed this way, it is clear that the question of when the damage to the wall rose to the level of a substantial impairment is a factual inquiry best left to the jury."). But this issue is better addressed at a later stage of the case, given the factual-bound nature of the inquiry.

The Amended Complaint sufficiently states a plausible claim that the basement walls were substantially impaired before 2006. The motion to dismiss therefore is denied with respect to Count I.[4]

### B.      Breach of the Implied Warranty of Good Faith and Fair Dealing

Count II of the Amended Complaint alleges that Defendants breached the implied covenant of good faith and fair dealing. *See* Am. Compl. ¶¶ 17-20. Amica has moved to dismiss this count, arguing that the Rosenbergers have failed to state a claim. The Court agrees.

In Connecticut, **"**[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 553 A.2d 1138, 1140 (Conn. 1989). To fulfill its duty, a party may not "do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004) (internal quotation marks and citation omitted).

"To constitute a breach of [the implied covenant], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's

---

[4] Because the Court holds that the Rosenbergers have plausibly pled breach of contract under the "collapse" provision, it does not address other provisions of the policies that the Rosenbergers argue would bring them within coverage.

rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.*

Amica's primary argument flows from its breach of contract argument: that there can be no breach of an implied covenant where there is not a breach of the contract. Def. Mem. at 32-34. Given the Court's denial of the motion to dismiss as to Count I, however, this argument is inapposite here.

The insurance company also argues that the Rosenbergers' claim is "fairly debatable" and therefore its denial would not be in bad faith. *Id.* at 35. Ultimately, Amica argues, "[p]laintiffs have failed to plead facts that plausibly demonstrate the type of dishonest purpose or sinister motive required to allege a bad faith claim . . . ." *Id.* at 36.

The factual allegations in Count II of the Amended Complaint are rather sparse. Plaintiffs allege that both parties were parties to a contract "under which the Plaintiffs expected to receive benefits" and that the Defendant "in its discretion, unreasonably and in bad faith" denied those benefits. Am. Compl. ¶¶ 17-18. They allege that Amica changed its policy language, or unreasonably delayed decisions specifically "for the purpose of denying benefits" even though the policy conferred such benefits. *Id.*

In concrete cases where breaches of the implied covenant have proceeded to discovery, plaintiffs usually have alleged specific behaviors on the part of defendants that would demonstrate bad faith. In *Karas*, for instance, the plaintiffs alleged that Liberty Mutual denied their claim without inspecting the walls and cited inapplicable policy provisions "solely for the purpose of preserving its own assets." 33 F. Supp. 3d at 116. Similar claims led the Court in *Belz*, 46 F. Supp. 3d at 165, and this Court in *Gabriel I,* 2015 WL 5684063, at *5, to deny motions to dismiss.

Here, the allegations merely restate the elements of a breach of the implied warranty of good faith and fair dealing, and, in conclusory fashion, allege bad faith. *Compare* Am. Compl. ¶¶ 17-20 *with* Pls. Mem. at 12 (quoting *Kowalchuk v. Travelers* at length to state standard for breach of implied covenants); *see also Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). But there is nothing to suggest anything other than a "mere coverage dispute" in the Amended Complaint. *See, e.g.*, *Kim v. State Farm Fire & Cas. Co*., No. 3:15-CV-879 (VLB), 2015 WL 6675532, at *4 (D. Conn. Oct. 30, 2015) (granting motion to dismiss with respect to implied covenant claim in concrete case); *cf. McCulloch v. Hartford Life & Acc. Ins. Co*., 363 F. Supp. 2d 169, 179 (D. Conn. 2005) (granting motion for summary judgment "[b]ecause the information Hartford obtained gave it a legitimate reason to terminate McCulloch's disability benefits, it cannot be said that Hartford acted in bad faith by terminating her benefits.").

The motion to dismiss therefore is granted with respect to Count II.

## C.     CUIPA and CUTPA

Finally, Amica moves to dismiss Count III of the Amended Complaint, which alleges a violation of CUIPA and CUTPA.  *See* Def. Mem. at 37-40.

CUIPA defines a number of actions as "unfair methods of competition and unfair and deceptive acts or business in the business of insurance."  Conn. Gen. Stat. Ann. § 38a-816. Included in CUIPA's prohibited acts are"[u]nfair claim settlement practices" such as "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *Kim*, 2015 WL 6675532, at *5.

CUIPA itself does not provide a cause of action; under Connecticut law, however, plaintiffs may assert a CUTPA claim based on a violation of CUIPA. *Karas*, 33 F. Supp. 3d at

117 (citing *McCulloch*, 363 F. Supp. 2d at 181 and *Mead v. Burns*, 199 Conn. 651, 663 (1986)).

To prevail on such a claim, the plaintiff must show that the defendant engaged in an act

prohibited by CUIPA and the act proximately caused the plaintiff's harm. *Belz*, 46 F. Supp. 3d at

165 (citing *McCulloch*, 363 F. Supp. 2d at 181). "A claim of unfair settlement practice under

CUIPA/CUTPA requires the plaintiff to allege that the defendant has committed the alleged

proscribed act with sufficient frequency to indicate a general business practice. . . . The plaintiff

must show more than a single act of insurance misconduct . . . ." *Karas*, 33 F. Supp. 3d at 117.

As with the implied covenant claim, Amica's primary argument is a corollary to their

argument regarding breach of contract: that there can be no violations of CUPTA/CUIPA where

there is no breach of contract. *See, e.g.*, *Hurlbut*, 2018 WL 1035810, at *9 ("As discussed

above, because the Hurlburts have failed to plead a plausible breach of contract claim, no

CUTPA or CUIPA claim can follow."). Here, the breach of contract claim does survive the

motion to dismiss.  As a result, that argument does not apply with respect to the CUTPA/CUIPA

claim.

Alternatively, Amica argues that the Rosenbergers failed to adequately plead their

CUPTA/CUIPA claim. Def. Mem. at 38. The company argues that the plaintiffs must show

"more than merely asserting" a "general business practice," and that opposing the Rosenbergers'

claim by itself would not sustain a CUPTA/CUIPA claim. *Id.* at 37-38. The Court agrees.

The Amended Complaint alleges that Amica "participates" in the ISO, an organization

composed mostly of insurance companies that collects data about insurance claims. Am. Compl.

¶ 21. Through its participation in the ISO, the Rosenbergers claim, "Defendant Central"[5] has

---

[5] Paragraphs 22 and 23 of the Amended Complaint refer to "Defendant Central." The complaint
does not include any other reference to this defendant. "The Court acknowledges this
discrepancy and treats it as a scrivener's error." *Hurlbut*, 2018 WL 1035810, at *2 n.1.

knowledge of the numerous claims and lawsuits that have arisen" related to concrete in a thirty mile radius of Stafford Springs, Connecticut. *Id.* ¶ 23. The plaintiffs allege that Amica attempted to deny coverage for claims based on information received in the ISO and that Amica "provided a false and misleading" denial of coverage. *Id.* ¶¶ 24, 26. Furthermore, Amica "has regularly denied claims in similar manners or on similar ground or other grounds, which can be found in other court cases," contrary to its policies and ultimately resulting in "oppressive, unethical, immoral and unscrupulous conduct . . . ." *Id.* ¶¶ 27-29.

These allegations do not contain the "factual amplification" that "render a claim plausible." *Arista Records LLC,* 604 F.3d at 120. Instead, the claims are merely conclusory, alleging a conspiracy without any concrete factual information to support the allegation, even when all allegations are deemed true and all inferences drawn in the Rosenbergers favor.

In *Belz*, for instance, plaintiffs had advocated for a "liberal pleading standard" that "would essentially allow plaintiffs access to discovery so long as they generally allege that the defendants have a general practice of unfair settlement practices." *Belz,* 46 F. Supp. 3d at 166. The court rejected this approach, holding that the "appropriate consideration is whether the plaintiff has made facially plausible factual allegations that, in the circumstances of the particular case, the defendant has engaged in the alleged wrongful acts enough to suggest it has a general business practice of doing so." *Id.* The court noted that relevant facts would include the "degree of similarity" between other cases and the plaintiff's, both in the alleged unfair practices and underlying claims, and "the degree to which the defendant is related to other entities engaging in similar practices." *Id.*

The Rosenbergers fail to present any concrete claims, outside of general allegations, that would support a CUTPA/CUIPA claims. They do not cite to any case where a Court determined

that Amica had wrongly denied a concrete claim. They rely on language related to other insurance companies or, in one case, *Halloran et al. v. Harleysville Prefered Insurance Co. et al.*, 3:16-cv-133 (VAB), a putative class action that has yet to resolve numerous pending motions to dismiss. In fact, in the vast majority of cases involving Amica's post-2006 policy language, the rulings have been decided in the insurance company's favor. *See, e.g.*, *England*, 2017 WL 3996394 at *5 (granting motion to dismiss where plaintiff had not alleged abrupt collapse); *Hurlburt*, 2018 WL 1035810, at *5 (granting motion to dismiss under similar policy language); *see also Jemiola,* 2017 WL 1258778, at *7 (granting summary judgment to nearly identical claims).[6]

Even assuming, then, that the Rosenbergers properly pled their breach of contract claim here, that claim would only amount to "a single act of insurance misconduct" and therefore would not be sufficient to state a claim under CUTPA/CUIPA. *Karas*, 33 F. Supp. 3d at 117 ("The plaintiff must show more than a single act of insurance misconduct; isolated instances of unfair settlement practices are not sufficient to establish a claim.").

The Rosenbergers have not plausibly alleged a violation of CUTPA/CUIPA, and the allegations in the Complaint are therefore insufficient to survive a motion to dismiss. The motion is granted with respect to Count III.

---

[6] This contrasts with other cases in this District where plaintiff alleged with specificity the number of claims denied. *See, e.g*, *Gabriel,* 2015 WL 5684063, at *5 ("Furthermore, the Gabriels allege that Liberty Mutual and related entities have denied coverage in at least four other cases involving similar facts and identical policy language."); *Karas*, 33 F. Supp. 3d at 117 (noting three separate cases); *Belz*, 46 F. Supp. 3d at 166 (noting "at least two" denials in complaint).

**IV.     CONCLUSION**

Defendant's motion to dismiss, ECF No. 36, the Amended Complaint is **GRANTED**

with respect to Counts II and III and **DENIED** with respect to Count I.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of June 2018.


                                                       /s/ Victor A. Bolden
                                                      Victor A. Bolden
                                                      United States District Judge